IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |  |
|---|---|---|
| WALID JAMMAL, *et al.*, | ) | CASE NO. 1:13 CV 437 |
|  | ) |  |
| Plaintiffs, | ) |  |
|  | ) |  |
| v. | ) | JUDGE DONALD C. NUGENT |
|  | ) |  |
| AMERICAN FAMILY INSURANCE | ) |  |
| GRP., *et al.*, | ) | MEMORANDUM OPINION |
|  | ) |  |
| Defendants. | ) |  |

This matter is pending before the Court following a twelve day bench trial, with an advisory jury, pursuant to Fed. R. Civ. Pro. 38(c)(1). During the course of the trial, the Plaintiffs called the following twenty-two witnesses: Dusty Rider; Scott Zurfluh (by video deposition); David Wunsch (by video deposition);

 Brian Edward McElroy (by video deposition); Ralph Kaye; Mary Schmoeger (by video deposition); Vicki Chvala (by video deposition); Gregory Benusa (by video deposition); Lori Snapp (by video deposition); Todd Struab (by video deposition); Deborah Ann Miller (by video deposition); La Tunja Jackson (by video deposition); Kathleen Tuersley; Walid Jammal; Ian H. Altman; Richard M. Steffen; Timothy Johnston (by video deposition); William Nystrom; Nathan Garrett; Gerald Shope (by video deposition); Renee Dauplaise (by video deposition); Melissa Padgett (by video deposition); and, Brian Stetler (by video deposition). The Defendants called the following five witnesses: Lisa Diemer; Debbie Miller (by video deposition); Brian Stetler (by video deposition); Jerry Benusa; and, Kurt McCabe. Both sides submitted exhibits. Following

trial, the parties were given the opportunity to submit proposed findings of fact and conclusions of law.  (ECF #316, 317).   The issues have now been fully presented.


## PROCEDURAL HISTORY

Plaintiffs, Walid Jammal, and Dana LaRiche  filed this proposed class action on February 28, 2013, against American Family Insurance Company (Group), American Family Mutual Insurance Company, American Family Life Insurance Company, and American Standard Insurance Company of Wisconsin.  On April 5, 2013, the Complaint was amended, adding American Family Termination Benefits Plan, Retirement Plan for Employees of American Family Insurance Group, American Family 401K Plan, Group Life Plan, Group Health Plan, Group Dental Plan, Long Term Disability Plan, American Family Insurance Group Master Retirement Trust, 401K Plan Administrative Committee, and The Committee of Employee and District Manager Retirement Plan as Defendants.[1]  (ECF #21).  The Amended Complaint also added named Plaintiffs Patricia McClain-Evans, Kathleen Tuersley, Cinda J. Durachinsky, and John Vincent.  (ECF #21).

Defendants challenged the First Amended Complaint through a Motion to Dismiss, which was denied by the Court on August 9, 2013.  On September 27, 2013, the Court issued an opinion postponing class discovery until discovery relating to the named Plaintiffs was complete and dispositive motions relating to those Plaintiffs had been addressed.

On June 30, 2014, the Complaint was amended a second time.  The Second Amended

---

[1]

The term "Defendants" will be used to refer to all Defendants, as well as, at times, to only the Defendant employers.

Complaint added named Plaintiff, Nathan Garrett, and eliminated Dana LaRiche, Patricia McClain-Evans, and John Vincent as named Plaintiffs. (ECF #67). Count One of the Complaint seeks declaratory judgment affirming that Plaintiffs and purported class members are "employees" for all purposes, including but not limited to ERISA; declaring that the Termination Benefits Plan is an employee benefit plan subject to ERISA's vesting and benefit accrual provisions; declaring that certain plan provisions violate ERISA; and, declaring that the Plaintiffs are entitled to reformation of the contracts and restitution of benefits allegedly withheld by American Family in violation of ERISA. Count Two seeks injunctive relief prohibiting Defendants from continuing to mis-classify its agents as independent contractors; prohibiting Defendants from implementing benefits plans that do not comply with ERISA; ordering American Family to comply with ERISA requirements with regard to the Termination Benefit Plan; and, ordering Defendants to recalculate and pay benefits under the proper calculation of benefits as provided by ERISA.

Count Three is a claim of benefits under ERISA § 502(a)(1)(B), seeking payments under the Termination Benefit Plan in accordance with ERISA requirements. Count Four seeks restitution, contract reformation, and actual damages arising from Defendants' alleged breach of fiduciary duty arising from their refusal to recognize that the benefits provided under the Termination Benefits Plan were vested and non-forfeitable pursuant to ERISA's requirements, and for failing to follow ERISA accrual and vesting requirements. Counts Five and Six seek damages and injunctive relief based on Plaintiffs failure to provide Plaintiffs with health and welfare benefits offered to other employees, including a retirement plan, 401K plan, group health plan, group dental plan, group life plan, and long term disability plan, that are offered to those

workers American Family has classified as employees.

Defendants filed Motions for Summary Judgment on the claims of the named Plaintiffs, Mr. Jammal, Ms. Durachinsky, Ms. Tuersley, and Mr. Garrett.  (ECF #70, 75, 77, 79).  The Court held that Ms. Tuersley was barred from pursuing her claim for breach of fiduciary duty under Count Four by the statute of limitations, and otherwise denied all four motions.  (ECF #114).  Plaintiffs later filed their Motion for Class Certification, and another Motion for Partial Summary Judgment.  (ECF #119, 123).  The Court denied the Defendants' Motion for Partial Summary Judgment (ECF #132), and granted the Motion for Class Certification (ECF #137). Defendants subsequently twice sought decertification of the class.  (ECF #174, 220).  Those requests were both denied.  (ECF #212, 221).

Prior to trial, the Court granted a Motion to Bifurcate to allow for a primary determination of the threshold question: Were Plaintiffs employees or independent contractors under ERISA?  (ECF #222).  Trial of this single issue commenced on April 3, 2017, before an advisory jury, pursuant to Fed. R. Civ. Pro. 39(c)(1).  On April 18, 2017, following twelve days of trial, the jury answered "yes" to the following interrogatory:

**Interrogatory**

Please answer the following question "yes" or "no" according to your findings:

Did Plaintiffs prove by a preponderance of the evidence that they are employees
of Defendant American Family?

After the advisory jury returned this finding, the parties were given a final opportunity to present their proposed findings of fact and conclusions of law.  The Court is not bound by the advisory jury's determination, but finds that it comports with the weight of the evidence presented at trial.

## ANALYSIS

1. Applicable law

The question  at issue, at this stage of the litigation, is whether American Family agents were independent contractors or employees for purposes of the Employee Retirement Income Security Act of 1974,  28 U.S.C. §1001, *et seq*. ("ERISA").  The Plaintiffs have the burden of proving by a preponderance of the evidence that they were employees and not independent contractors under ERISA.

 In order to determine employment status under ERISA, courts are instructed to look at the degree to which the hiring party retains the right to control the manner and means by which the service is accomplished.  *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 320-21 (1992); *Weary v. Cochran*, 377 F.3d 522, 524 (6th Cir 2004).   The Sixth Circuit has consistently held that a worker can be classified as an "employee" if the employer retains the right to direct or control the manner and means of work, if it does not exercise this right.  *See, Peno Trucking, Inc. V. C.I.R.,* 296 F.App'x 449, 456 (6th Cir. 2008); *N.L.R.B. v. Cement Transp., Inc*., 490 F.2d 1024, 1027 (6th Cir. 1974)("It is the right to control, not its exercise, that determines an employee relationship.").

The United States Supreme Court outlined several factors in *Darden* that  a court should consider when deciding whether the hiring party retains the right to control the manner and means by which the service is accomplished.  These include:

1) the skill required;

2) the source of the instrumentalities and tools;

3) the location of the work;

4) the duration of the relationship between the parties;

5) whether the hiring party has the right to assign additional projects to the hired party;

6) the extent of the hired party's discretion over when and how long to work;

7) the method of payment;

8) the hired party's role in hiring and paying assistants;

9) whether the work is part of the regular business of the hiring party;

10) the provision of employee benefits; and,

11) the tax treatment of the hired party.

*Darden*, 503 U.S. at 323-24. These factors are non-exclusive. *Ware v. United States*, 67 F.3d 574, 577 (6th Cir. 1995). Although the factors listed above are to be considered, "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *Darden*, 503 U.S. at 324.

The Sixth Circuit has held that an express agreement between the parties is also a relevant factor to be considered. *See, Weary v. Cochran*, 377 F.3d 522, 527 (6th Cir. 2004). Any such agreement is considered "best evidence" of the parties intent, but is not dispositive of the question of whether the employer retained the right to exercise control. *See, Weary at*527; *Janette v. American Fidelity Group, Ltd.*, 298 F. App'x 467, 471 (6th Cir. 2008); *Taylor v. American Income Life Ins. Co.*, No. 1:13 CV 31, 2013 WL 2087359, at *2 (N.D. Ohio May 14, 2013). The Sixth Circuit has also "repeatedly held that the 'employer's ability to control job performance and the employment opportunities of the aggrieved individual' are the most important of the many factors to be considered." *Marie v. Am. Red Cross*, 771 F.3d 344, 356 (6th

Cir. 2014)(quoting *Janette v. Am. Fid. Grp., Ltd.*, 298 F. App'x 467, 472 (6th Cir. 2008) and

citing *Simpson v. Ernst & Young*, 100 F.3d 436, 442 (6th Cir. 1997); *Trs. Of the Resilient Floor*

*Decorators Ins. Fund v. A & M Installations, Inc.*, 395 F.3d 244, 249 (6th Cir. 2005); and

*Johnson v. City of Saline*, 151 F.3d 564, 568 (6th Cir. 1998)).


2.  Evidence at Trial

American Family is an insurance company whose business is selling insurance. Tr.

224:24-25; 225:3-5. The testimony was undisputed that American Family agents are core to its

business. Tr. 1214:3-7, 1220:17-20 ("the agents are the bedrock of American Family")

(Steffen); Tr. 468:1-469:3 (Benusa). American Family took in an average of $6 billion in

premiums over the last five years and, at least 85% of those premiums were brought in through

American Family agents. Tr. 1215: 14 -1216:4 (Steffen); Tr. 469:11-469:3 (Benusa). American

Family also has some employees, classified as such, who sell insurance and interact with

customers. Tr. 1204:23-1205:9 (Steffen).

American Family does not require any specialized knowledge or expertise to be hired as

an American Family agent. Tr. 230:5-231:11 (Zurfluh); Tr. 572:10-14 (Miller); see also, Tr.

1906:15-21 (Benusa); Tr. 1242:4-7 (Steffen); Tr. 128:3-6 (Rider); Tr. 904:1-12, 907:5-18

(Jammal); Tr. 1819:9-10 (Diemer); Tr. 741:13-742:11 (Tuersley); Tr. 413:19-24 (Kaye); Tr.

1340:15-19 (Nystrom); Tr. 1625:9-1626:20 (Garrett). The only requirements for hire are a high

school diploma and two years of general work experience in any field. Tr. 230:5-231:11

(Zurfluh); Pl. Ex. 391, 547. American Family prefers to hire agents with no prior experience so

they can be trained in the "American Family way" and will not have pre-established attitudes or

procedures.  Tr. 396:6-16 (Kaye); Tr. 247:6-8 (Wunsch); Tr. 288:17-289:8 (McElroy); Tr. 129:1-7 (Rider).

A license to sell insurance is not required for hire.  Tr.  128:7-15 (Rider); 1340:18-19 (Nystrom).  In fact, the company's general rule is that "any [candidate who] has ever been a sales agent or acted as one on behalf of any [other] Insurance Company, is not eligible for an agency position with American Family Insurance."  Pl. Ex. 391; Tr. 1051:14-25, 1052:17-24; 1053:3-7 (Steffen).  Obtaining and maintaining a license to sell insurance is a legal requirement imposed by the states.  Tr. 1245:22-1246:3 (Steffen), 1480:21-23 (Garrett).  After hire, American agents are required by the company to obtain and maintain a license "in accordance with the laws of the state in which [they] reside," at their own expense.  Tr.  1480:4-10; 1480:24-1481:5 (Garrett).

American Family teaches agents everything they needed to know to become licensed, run an agency, and sell American Family insurance.  Tr. 128:19-25 (Rider); Tr. 1340:20-25 (Nystrom); Tr. 1198:12-16 (Steffen); Tr. 289:25-290:3 (McElroy); Tr. 572:17-20 (Miller); Tr. 1644:1-9 (Shope); Tr. 752:9-755:5 (Tuersley); Tr. 917:9-23 (Jammal); Pl. Ex. 754.  All agents are paid to attend a mandatory two to three month long  "comprehensive training program" on how to sell and how to operate an agency.  Pl. Ex. 754; Tr. 1648:25-1649:7 (Shope); Tr. 916:14-918:4 (Jammal); Tr. 1405:7-9 (Garrett).  Agents are paid a monthly stipend and expenses during the training.  *Id.*  American Family maintained an agent-in-training program where it placed agents with a mentor to train in an already established American Family office.  Tr. 1403:25-1404:5 (Garrett).  During their participation in the agent-in-training program, new agents were originally classified as independent contractors, but were paid a month salary, required to maintain regular hours, perform mandatory sales activities, and to track and report all of their

activities on a weekly basis.  Tr. 1406:8-20, 1407:2-24 (Garrett); Pl. Ex. 18-4.  In 2013, agents-in-training were re-classified as employees.  Tr 1204: 2-14 (Steffen).

Plaintiff, Mr. Garrett has a college degree in risk management in insurance. Tr. 1491:2-6 (Garrett); Defs.' Ex. 54 at p. 2. He took college courses in commercial insurance, group benefits and health insurance, financial management, and life insurance. Tr. 1491:7-1492:5 (Garrett). He acquired life insurance credits towards the Chartered Life Underwriter ("CLU") designation, a specialized designation in the insurance industry, as well as the group benefits credit. Tr. 1492:7-18 (Garrett); Defs.' Ex. 54 at p. 2. He interned with an insurance agent during his last two (2) years in college. Tr. 1493:8-1495:3 (Garrett); Defs.' Ex. 54 at p. 3; Defs.' Ex. 55 at p. 1. He also earned his Series 6 and 63 securities licenses. Defs.' Ex. 369 at p.1.  Mr. Garrett had sales and managerial experience before he ever came to work at American Family, and felt that he was capable of running his own agency. Tr. 1497:6-20 (Garrett); Defs.' Ex. 54 at p. 3. Nothing in American Family's training taught Mr. Garrett how to form a relationship, gain trust, and get someone to make a sale; those were skills he already had. Tr. 1549:14-1550:22 (Garrett).

Plaintiff, Ms. Tuersley received her insurance license from Hondros College in 1995, which included courses in property, casualty, and life insurance, approximately four years before becoming an American Family agent. Tr. 783:14-785:1 (Tuersley).  She also had experience in sales and management with other industries, not involving the sale of insurance. Tr.741:23-742:3, 785:2-6 (Tuersley).   Plaintiff, Mr. Jammal owned his own business prior to becoming an American Family agent. Tr. 904:3-12 (Jammal). When he decided to seek other opportunities, Mr. Jammal obtained various insurance licenses, including life and health, after which he received a number of work offers from insurance companies. Tr. 904:13-905:18 (Jammal).

The Agent Agreement ("Agreement") entered into between the Plaintiffs and Defendant American Family Insurance Group contained a paragraph either identical to or substantively similar to the one below:

> It is the intent of the parties hereto that you are not an employee of the Company for any purpose, but are an independent contractor for all purposes, including federal taxation with full control of your activities and the right to exercise independent judgment as to time, place and manner of soliciting insurance, servicing policyholders and otherwise carrying out the provisions of this agreement. As an independent contractor you are responsible for your self-employment taxes and are not eligible for various employee benefits such as Workers and Unemployment Compensation.

Defs.' Ex. 57 at p. 4; Defs.' Ex. 132 at p. 4; Defs.' Ex. 206 at p. 4.

The Agreement also provides that:

> Rates, rules, regulations and all provisions contained in the Company's Agent's Manuals and all changes to them shall be binding upon you. If any inconsistency or ambiguity exists between this agreement and such rate, rule, regulation, provision or other statement or statements, whether written or oral, this agreement shall control.

Defs.' Ex. 57 at p. 8; Defs.' Ex. 132 at p. 8; Defs.' Ex. 206 at p. 8.

There is no limit on the duration of the agency relationship. Jt. Ex. 1-4 §6.g; Tr. 576:17-21 (Miller); Tr. 744:4-11 (Tuersley). American Family describes the agency position as a "career" position. Pl. Ex. 754-1; Pl. Ex. 425; Tr. 912:9-16 (Jammal); Tr. 743:18-744:16 (Tuersley).

American Family pays its agents in commissions. Tr. 189:2-6 (Rider); Tr. 808:3-6 (Tuersley); 963:12-18 (Jammal); 1346:5-7 (Nystrom); 1577:13-15 (Garrett); 1888:10-13 (Miller); 1912:19-22 (Benusa). It sometimes also paid advance commissions to newer agents, which were then required to be re-paid. See, Tr. 1909:1-15 (Benusa); Tr. 791:3-12 (Tuersley). American Family does not provide agents with vacation pay, holiday pay, sick pay, or paid time

off.  Agents are not eligible for the same pension or retirement plans offered to American Family employees, and they are required to obtain and pay for their own insurance.  Tr. 810:21-811:13 (Tuersley); 1251:15-17 (Steffen); 1587:6-20 (Garrett); 1915:4-6 (Benusa); Tr. 644:6-21 (Miller).  The testimony showed that agents were offered an "extended earnings" benefit based on their years of service.  Tr. 1247:8-1249:7 (Steffen); 1388:10-20 (Nystrom); 1587:21-1588:23 (Garrett); 1915:7-1917:10(Benusa); Defs.' Ex. 57 at p. 5; Jt. Ex. 1-7.   This plan offered a lifetime annuity, and was described to the agents as a retirement plan.  Tr. 292:2-12 (McElroy); Tr. 574:15-575:5 (Miller); Tr. 746:3-20 (Tuersley); Tr. 129:16-17 (Rider); Tr. 1341:7-9 (Nystrom).  Plaintiffs presented expert testimony from Mr. Altman during which he provided his opinion that the extended earnings or termination benefits outlined in the 1993 and 2003 Agent Agreements both have the characteristics of a retirement or pension plan.  Tr.  1019: 18 -1024:5 (Altm12).  American Family reported the extended earnings plan as one of its "Defined Benefit Plans" in the annual statement it filed with the insurance regulators.  Pl. Ex. 976-29; P. Ex. 977-29.

The Plaintiffs testified that they filed their taxes as if they were independent contractors, and that they deducted business expenses as self-employed business owners.  See, Tr. 822:23-823:5, 827:15-828:4 (Tuersley); 914:9-11, 989:9-17,1001:1-1002:21 (Jammal); 1590:9-1591:13, 1593:5-1594:2 (Garrett).  Mr. Garrett took tax deductions for business expenses such as advertising, car and truck, commissions and fees paid, depreciation, insurance payments, legal and professional services, office expense, rent of business property, repairs and maintenance, supplies, taxes and licenses, business travel, meals and entertainment, utilities, wages paid to employees, postage, business telephone, dues and subscriptions, and training. Tr. 1595:9-1598:8

(Garrett); Defs.' Ex. 41 at pp. 7-8; Defs.' Ex. 42 at pp. 3-4; Defs.' Ex. 43 at pp. 6-7; Defs.' Ex. 44 at pp. 2, 11; Defs.' Ex. 45 at pp. 1, 9; Defs.' Ex. 46 at pp. 1, 9; Defs.' Ex. 47 at pp. 1, 10. In 2005, Tuersley took tax deductions for business expenses in the amount of $86,373. Tr. 832:5-7 (Tuersley); Defs.' Ex. 197 at pp. 9-10, 15.

The company calls its agents "business owners" and "partners" and tells new agents they will be "agency business" owners and that they need to "invest" in "their business." Tr. 291:19-23 (McElroy); Tr. 574:4-14 (Miller); Tr. 2090:4-15 (McCabe); Tr. 909:11-910:24, 920:11-25 (Jammal); Tr. 742:18-743:5 (Tuersley); Tr. 1404:6-12, 1413:5-7 (Garrett); Tr. 1943:8 (Benusa); Tr. 2085:16-19 (McCabe). Agents do not own a book of business; there is no book of business separate and distinct from American Family's business. Tr. 1908:8-10 (Benusa); Tr. 291:8-14; Tr. 478:20-479:6; Tr. 210:2-3, 10-25; 211:8-14; Tr. 572:25-573:22 (Miller); Tr. 401:22-403:18 (Kaye); Tr. 211:11-14; Pl. Ex. 438-2. Mr. Wunsch testified that agents did not own their own policies. Tr. 247: 16 (Wunsch). American Family retains "total control over where those policies go and to what agent." Tr. 1160:18-23 (Steffen). Even during the agency relationship, the company retains the right to transfer customers to other agents at its own discretion, at any time. Tr. 1156:20-1161:2 (Steffen); Jt. Ex. 1-4, §6.e.; Tr. 478:20-479:6 (Benusa).

An American Family agent cannot sell their agency. Tr. 2082:16-17, 2086:6-11 (McCabe). American Family prohibits agents from assigning any rights to income from their agency. Jt. Ex. 1-4, §6.c. Customers brought in and serviced by agents are considered American Family customers who are merely being serviced by the agents. Pl. Ex. 438-2. It is undisputed that American Family agents are prohibited from selling competitive insurance products. Tr. 745:12-746:2 (Tuersley). Agents must work exclusively for American Family. Jt. Ex. 1-2 §4a;

-12-

Tr. 2082:18-21 (McCabe); Tr. 903:16-25 (Jammal); Tr. 745:12-14 (Tuersley); Pl. Ex. 532-10.

They may not sell another company's policy "[e]ven if the insurance sold by that carrier isn't

sold by American Family."  Pl. Ex. 532-10; see also, Tr. 745:12-746 :2 (Tuersley).  American

Family discourages additional employment by agents even if it is unrelated to the insurance

industry, and has threatened to terminate agents in order to persuade them to leave a second job.

Tr. 133:15-21 (Rider); Tr. 959:15-960:7 (Jammal).  Agents are also required to agree to a one-

year non-solicitation provision prohibiting them from contacting any customer credited to their

account if they separate from American Family.  Jt. Ex. 1-5, §6.k.  Any investment an agent

makes to grow his client base is not recoverable if he or she separates from American Family.

Tr. 1644:10-24 (Shope); Tr. 973:18-19 (Jammal); Tr. 1348:25-1349:7 (Nystrom).

American Family agents must work out of an agency office and may not work from

home.  Tr. 921:11-15 (Jammal); Tr. 750:24-751:3 (Tuersley).  Mr. Jammal worked out of a

building he had purchased.  Tr. 923, 933:8-9, 987:3-24 (Jammal).  He rented out space in the

building to other entities.  Tr. 990-991 (Jammal).  Ms. Tuersley also had her own office.  Tr.

818:14-17 (Tuersley).  Mr. Garrett worked out of his office in Pittsburg, Kansas.  He could have

sold insurance anywhere in the State of Kansas from that office.  Tr. 1576:12-15 (Garrett).

There was testimony that American Family assigns agents to a particular geographic district and

that they have to maintain their office within that district.  Tr. 751:16-21 (Tuersley).  There was

also testimony that American Family is regularly involved in its agents' office selections and

retains a right to approve or disapprove where an agent's office is located.  Tr. 401:2-6 (Kaye);

Tr. 750:19-7511:25 (Tuersley); Tr. 921:11-924:6 (Jammal); Tr. 140:12-143:5 (Rider); Pl. Ex.

210-211.  American Family has a general policy that agents should locate their offices at least

one mile apart.  Tr. 666:7-16; 667:4-16 (Jackson); Tr. 751:12-752:5, 820:2-15 (Tuersley).  There

was testimony indicating that American Family enforced its right to approve locations in some

instances but not in others.  For instance, Mr. Rider testified that American Family would not

allow him to open a satellite office in a neighboring town.  (Tr. 142:22-143:4 (Rider).  American

Family also told Mr. Jammal he could not use a building he had decided to purchase, and that he

had to find a different location.  Tr. 922:14-924:6 (Jammal).  However, when Plaintiff, Ms.

Tuersley asked American Family to tell another agent to re-locate because they were within a

mile of her office, American Family told her it did not have the power to do so.  Tr. 818:15-25,

820:2-25, 822-823:9 (Tuersley); Def. Ex. 228, 229.  Also Ms. Diemer testified that she picked

her own office location and no one from American Family had any input on her decision.  Tr.

1833: 1-7 (Diemer).

        Agents are required to comply with American Family's code of ethics.  Tr. 803:24-805:1

(Tuersley); 1486:9-11 (Garrett).  American Family monitored agents' emails and computer

usage.  Tr. 925:8-20 (Jammal); Tr. 753:23-754:2 (Tuersley); Tr. 145:22-146:4 (Rider); Tr.

673:21-674:1 (Jackson); Pl. Ex. 532-7.  American Family retained the right to block agency

access to websites, including on-line retailers, barred non-American Family computers from

accessing the agents' internet, and barred agents and agency staff from using American Family

issued computers to access their personal email accounts.  Tr. 924:24-925:10 (Jammal); Pl. Ex.

532-8.  Managers could use the American Family computer system to track and monitor agent

activity on a daily basis.  Tr. 1663:5-15 (Shope).  Ms. Tuersley testified that other insurance

agencies do not retain the right to access their independent agents' computer systems or monitor

agents' email.  Tr. 754:3-8 (Tuersley).  When an agent's relationship with American Family is

terminated, American Family shuts off computer access and collects the hardware. Tr. 146:9-18 (Rider); Tr. 775:24-776:6 (Tuersley). If agents do not return their computer, American Family can declare their retirement benefits forfeited and stop payment. Jt. Ex. 1-5, § 6.l.2; Jt. Ex. 1-7, § 6.u.; Tr. 146:9-18 (Rider).

Agents testified that they hired their own staff, paid the staff's wages, and decided whether to offer employee benefits to their staff. See, Tr. 987:25-988:9 (Jammal); Tr. 806:11-18, 807:3-20, 811:14-16 (Tuersley); Defs.' Ex. 369, at p. 1; 1523:7-21, 1533:4-8, 1542:9, 1622:13-17 (Garrett); Tr. 1834:14- 1835:15 (Diemer). American Family provides advertisement for agency staff positions on its website, and it will recruit and screen potential agency staff for the agents. It also provides subsidies for some agents to help them hire staff. Pl. Ex. 756-1, 756-8; Tr. 1394:17-1395:3 (Nystrom). A former manager, Mr. McElroy testified that managers could tell agents what staff they could hire. Tr. 298: 14-17 (McElroy). There was testimony indicating that American Family retained the right to approve the hiring of staff, and to fire agency staff. Tr. 584:17-19 (Miller); Tr. 926:19-927:8, 928:6-8 (Jammal); Tr. 758:20-760:16 (Tuersley); Tr. 156:4-157:1 (Rider); Pl. Ex. 434; Tr. 340:7-25 (McElroy). American Family admits that they retained these rights with regard to appointed staff. Tr. 1161:7-1162:11, 1164:6-14 (Steffen). Appointed agency staff are those staff who interact with customers. Tr. 1154:11-18 (Steffen); 1834:17-20 (Diemer). There was conflicting testimony as to whether American Family had any role in hiring non-appointed staff. See, Tr. 1827:9-16 (Diemer); Tr. 926:19-927:8 (Jammal); Tr. 1877:9-15 (Miller). Managers were evaluated based on whether their agents hired a certain number of staff. Pl. Ex. 328-1; Pl. Ex. 884; Tr. 1418:2-16, 1419:17-1420:9 (Garrett).

American Family imposes qualification standards on agents' appointed staff. Tr. 1161:7-

1162:11, 1164:6-14 (Steffen).  State insurance law also imposes some licensing requirements on agency staff.  Tr. 1580:11-1582:23 (Garrett); Defs.' Ex. 62.   American Family required that appointed staff be licensed.  It also imposed minimum education standards, driving record requirements, and credit score requirements on agency staff.  Pl. Ex. 533-1; Tr. 1343:9-1344:3 (Nystrom).  After this lawsuit was filed, American Family eliminated the additional (non-licensing) criteria.  Tr. 2118:21-22 (McCabe).   All agency staff are required to abide by American Family's Code of Conduct, and American Family retains the right to fire any staff for a breach of that Code.  Pl. Ex. 532; Tr. 927:23-928:1 (Jammal).  Appointed staff are required by American Family to sign a non-compete agreement prohibiting them forever from soliciting any policyholder credited to their agency's account.  Tr. 1155:1-1156:11 (Steffen).

It is undisputed that American Family requires agents to pay for many of the tools of their trade, including some of the tools issued by the company.  District Manager Kurt McCabe testified that after he became a District Manager, the agents in his district were responsible for purchasing items used to run their agencies, such as their offices, office supplies, telephones, office furniture, and automobile. Tr. 2005:14-2006:15 (McCabe).  With the exception of a computer that American Family issued him, Mr. Garrett testified that he paid for all the other equipment he used. Tr. 1490:6-9 (Garrett). This included business expenses such as office rent, equipment, furniture, telephones, vehicle expenses, office supplies, utilities, employee wages, and some advertising. Tr. 1578:3-21 (Garrett).  Ms. Tuersley testified that she paid for expenses associated with her agency, including setting up telephone lines, marketing, advertising, lunches or centers of influence, car, gas, utilities, postage, rent, legal and professional services, taxes, insurance licenses, client entertainment, business donations, cleaning, signage, professional

publications and seminars. Tr. 828:20-833:10 (Tuersley).

The testimony was undisputed, that American Family provided all brochures, applications, letterhead, forms, products, marketing materials, and websites. Tr. 752:15-753:1, 754:10-25 (Tuersley). American Family also provided agents with "access to online tools" and "all branded resources," including the above-mentioned resources, office signs, the brand and logo, the benefit of national and regional advertising and marketing campaigns, and social media content. Tr. 1649:18-1650:2 (Shope); Pl. Ex. 754-1. American Family also provided agents with a call center that was "always available to agents and customers" for 24/7 customer service. Pl. Ex. 754-1. Mr. Jammal also testified that American Family retained the right to approve any advertising. Tr. 988:12-989:2 (Jammal). Company representatives testified that American Family subsidizes 50% of the agent's cost of marketing. Tr. 1078:6-12 (Steffen); Tr. 575:11-16 (Miller); Tr. 1647:23-1650:2 (Shope).

American Family also provided the computers and software agents are required to use. Tr. 145:14-21 (Rider); Tr. 924:8-21 (Jammal); Tr. 752:21-754:2 (Tuersley). There was some testimony that although American Family required use of the provided computers, it required the agents to lease the computers from American Family on a long-term lease at up to $300/month. Tr. 924:7-925:7 (Jammal); Tr. 146:2-4 (Rider). American Family provides each agent with their own American Family agent website and email address, which they are required to use, as well as other social media. Tr. 1119:24-1120:10 (Steffen). Agents are not permitted to use their own website, emails, or social media. See, Tr. 925:8-20 (Jammal); Tr. 1119:24-1120:10 (Steffen); Tr. 753:23-754:2 (Tuersley); Tr. 673:21-674:1 (Jackson); Pl. Ex. 532-7.

There was testimony indicating that American Family reimbursed agents for certain

staffing and marketing expenses. Tr. 1078:6-12 (Steffen); 1498:10-25, 1578:12-13 (Garrett); Tr. 1346:16-20 (Nystrom). Mr. McElroy testified that American Family would enter into subsidy programs for new agents to pay for all of their office expenses, including phone, power, electric, staff expense, and a monthly stipend for up to four years. Tr. 292:12 -293:2 (McElroy). He also testified that this program allowed American Family to exert additional control over the agents: "as long an agent owes American Family money, we own them. We can tell them exactly what to do." Tr. 293:6-22 (McElroy). There is evidence that this debt could take years to pay off, and that some agents never reached a point where it was fully paid. Tr. 293:10-22 (McElroy). There was also testimony that American Family would coerce agents into taking loans they did not need so they would be in debt to the company. Tr. 969:5-970:6 (Jammal).

There was evidence presented that American Family has invested significant amounts of money to train, supply, and support its agents. American Family's sales department has one thousand employees and entire departments that exist solely to support its 2,800 agents. Tr. 229:17-20; Tr. 1926:7-14, 1927:11-18 (Benusa); Tr. 458:17-459:17 (Chvala); Pl. Ex. 754-1. Mr. Steffen testified that "millions and millions of dollars" are spent on research and data to assist agents in servicing American Family customers. Tr. 1062:10-1063:8; 1064:23-1065:3 (Steffen). American Family pays its agents about 13.5% of its total revenue. Mr. Steffen testified that percentage would not change if they were to be considered employees, but would have to include costs that are now born by the agents themselves, including the cost of paid days off, and insurance. Tr. 1202:2-18 (Steffen).

American Family agents are assigned to a district and a geographical territory, and must report to an Agency Sales Managers. Tr. 227:4-228:25 (Zurfluh); Tr. 760:24-761:1 (Tuersley).

American Family employs between 140-200 managers to manage approximately 3,000 agents. Tr. 1198: 22-25 (Steffen); Pl Ex. 1065-3; Pl. Ex. 1064-5. These Agency Sales Managers, previously referred to as "District Managers" ("managers") are employees of American Family. Tr. 1071:13-18, 1199:24-25 (Steffen); . Although they are employees, managers are given an expense account to run promotions and incentives for their agents, and are required to pay for their own rent and assistants from that account. Although they are employees they are also responsible for hiring their own assistants. Tr. 1200: 20- 1201:11 (Steffen).

The Company describes the manger's role as a "strategic business partner who ensures alignment with corporate goals through the successful and sustainable implementation of agency business plans." Pl. Ex. 323; Pl. Ex. 329; Pl. Ex. 330 (emphasis added). The manager's objective is to "engage agents in corporate strategy and direction" and "influence desired results." *Id.* The "desired results," are those set by American Family, not the agents. Tr. 618:3-5 (Miller); Tr. 1335:3-23 (Nystrom); Tr. 166:19-168:2 (Rider); Tr. 938:24-939:21 (Jammal). American Family expects a manager's "key competencies" to include: "Develops and executes plans to achieve results," "Achieves desired results," "Communicates clear expectations," and "Holds people accountable for performance." Pl. Ex. 338, Pl. Ex. 329, Pl. Ex. 330.

Agency Sales Managers report to State Sales Directors, who report to one of three Regional Vice-Presidents, who, in turn, report to the Chief Sales Officer. Tr: 227:4-228:25 (Zurfluh). Other than their agents, American Family classifies everyone in its sales force chain as employees. Tr. 228:11-229:3; Tr. 469:11-14 (Benusa); Tr. 571:24-572:2 (Miller). According to the managers' training policies, the job of this sales force is to implement and meet American Family's strategic plan for production (sales) and customer service goals. Pl. Ex. 338, 323, 329,

-19-

330; Tr. 1066:1-12, 1067:4-8 (Steffen); Tr. 613:8-16 (Miller); Tr. 294:10-295:16 (McElroy); Tr. 226:9-227:3 (Zurfluh). This hierarchy was established to ensure that agents sell the mix of business American Family prefers to sell, and that they interact with customers in the way American Family wants them to interact. Tr. 227:4-228:25; Tr. 280:4-24 (McElroy); Tr. 612:16-25; 613:8-16 (Miller), Pl. Ex. 338, 323, 329, 330, 18, 19, 328, 660; Tr. 2106:1-4; Tr. 2110:3-10 (McCabe); Tr. 1130:25-1131:24 (Steffen).

There was conflicting testimony as to whether agents had control over the methods and means of reaching the production, profitability, and service expectations established by American Family. Tr. 1188:15-1189:4 (Steffen); 1830:23-1831:2 (Diemer); Tr. 1349:25-1350:1 (Nystrom)("you have to do exactly what . . . corporate tells you to do."); Tr. 298:11-17 (McElroy)("We had direct control of all their activities."); Tr. 1639:6-21 (Shope)("I would say they retain a great deal of authority. . . I'd say they control."). Ms. Diemer testified that American Family never told her she needed to sell insurance in a certain way, or using a certain technique. Tr. 1846:6-9 (Diemer).

 American Family's witnesses agreed that the job of the managers is to manage the agents. Tr. 1067:25-1068:14 (Steffen); Tr. 508:7-9 (Benusa); Tr. 2080:22-2081:13 (McCabe). American Family's definition of the Agency Sales Manager's job responsibilities makes clear that their role is to manage the agents and implement American Family's sales plan at the agency level. Tr. 612:16-25; 613:8-16 (Miller); Pl. Ex. 338, Pl. Ex. 323, PX 329, Pl. Ex. 330.

There was testimony suggesting that managers did not simply track that agents met the numbers they were required to meet, but were also involved in the agents' day to day work, and influenced how agents met those goals. Tr. 581:8-16, 600:5-13 (Miller); Tr. 2097:4-15

(McCabe); Tr. 300:2-10 (McElroy). Mr. Kaye testified that American Family retains the right to control how agents do business. Tr. 403:15-24; Tr. 404:2- 13 (Kaye). Some agents testified that the managers were very forceful and demanding, and threatened agents to achieve compliance. Tr. 764:19- 765:11 (Tuersley). Ms. Tuersley testified that her manager even ordered her to have his name on her premium trust bank account. Tr. 764:12-22 (Tuersley). American Family agent, Ms. Diemer testified that she viewed her manager as a business partner, and that he did not tell her what to do, how to run her agency, or how to go about selling insurance. Tr. 1824: 15-23 (Diemer).

Mr. McElroy testified that managers could tell the agents what hours they needed to be open. Tr. 298:11-17 (McElroy). There was testimony that American Family has a rule that agencies must be open and staffed by someone who can service customers during normal business hours. Tr. 113:12-13; Tr. 2262:13-21; Tr. 339:6-10 (McElroy); Tr. 583:14-584:16 (Miller); Tr. 1666:5-14 (Shope). Plaintiffs also testified, however, that they could have their own employees run their office in their place, at their discretion. Tr. 930:23-25, 996:10-997:12 (Jammal). Ms. Diemer testified that no one from American Family had ever told her when she had to have her agency open. Tr. 1837: 11-23 (Diemer). Managers could direct agents on when they could close the agency and Plaintiffs testified that agents could take no vacation without approval. Tr. 307:25-308:15 (McElroy); Tr. 166:1-5 (Rider); Tr. 1342:24-1342:1 (Nystrom); Tr. 960:19-961:3 (Jammal); Tr. 756:19-21 (Tuersley).

If an agent tried to implement "summer hours," closing the agency early on Fridays, they could and would be reprimanded. Tr. 1427:10-1431:8 (Garrett); Tr. 583:14-584:16 (Miller); Tr. 143-23:144:4 (Rider). Managers were required to do drop-ins to verify that agents had their

offices open during regular business hours.  Tr. 339:16-340:3 (McElroy); Tr. 932:4-22 (Jammal); Tr. 756:10-758:11 (Tuersley); Pl. Ex. 139-140.  Ms. Tuersley testified that when a manager dropped by her office while she was on vacation he took over her office, answered her phone, and requested her password from her office staff.  Tr. 756:25-758:11 (Tuersley).  Ms. Diemer, however, testified that she has occasionally taken vacations, personal days, or sick days.  She testified that she did not need to obtain permission from her manager for vacations, but she did inform him as a matter of courtesy.  Tr. 1838:3-18 (Diemer).

Agents received annual reviews and had production goals they were required to reach. Tr. 866:4-6 (Tuersley); 1466:4-6 (Garrett); Tr. 766:4-18 (Tuersley); 948:3-20 (Jammal). Although some American Family witnesses testified that agents were allowed to set their own production goals and were not required to prepare business plans, (Tr. 1127:9-22 (Steffen); Tr. 1731:20-24 (Dauplaise)), there was significant evidence indicating that agents were required to develop business plans incorporating required initiatives; that managers could revise those plans; that the plans had to be approved by upper management; and, that, once approved, the plans, including any edits made by management, were binding on the agents.  Pl. Ex. 204; Tr. 579:8-580:16, 586:3-5, 615:24-616:4 (Miller); Tr. 1667:21-1169:2 (Shope); Tr. 938:19-940:19 (Jammal); Tr. 768:7-8 (Tuersley); Tr. 1335:3-1336:2 (Nystrom); Tr. 166:19-168:2 (Rider); Pl. Ex. 338; 307:14-21 (McElroy).

American Family requires agents to meet certain production, profitability, and service expectations.  Tr. 1187:14-24 (Steffen); 1216:12-20 (Steffen); 1291:23-1292:2 (Steffen); 1984:6-11 (Benusa).  Agents were required to comply with deadlines and other requirements.  Tr. 940:22-942:20 (Jammal); 947:23-949:17 (Jammal).  The manager's job depends on the results of

the agents and how much the agents sell. Tr. 319:4-320:2 (McElroy); Tr. 660:9-19 (Jackson). If the agents in a manager's district did not perform, the manager faced termination. Tr. 212: 5-11 (Zurfluh); Tr. 319:4-320:2 (McElroy).

At American Family, an agent could run a solid, profitable agency but still risk termination if he or she did not grow at the pace American Family demanded or grew at a slower pace than other agents in the district. Tr. 1122:25-1123:17, 1125:6-18, 1130:1-10 (Steffen); Tr. 766:4-8 (Tuersley). American Family frames its growth demands as "production" requirements, but in reality upper-level managers could just direct the Agency Sales Managers to "find the bottom three [agents] in each district … and then issue performance letters to them" to start the termination process. Tr. 618:22-619:13 (Miller). Numbers could be manipulated "depending on which numbers [the manager] wanted to pull out of the hat," and this process generally targeted veteran agents with established agencies to persuade them to retire. Tr. 618:22-619:13 (Miller). Up through at least 2013, production requirements were based on the number of new applications filed, not on the premiums brought in by an agents, and agents had to meet their district's goals for new quotes and applications or be put on a performance improvement plan, regardless of much premium they brought to the company.  Tr. 1125: 25-1126:12 (Steffen). American Family did not dispute that they can require agents to expand their business and sell certain specific mixes of policies.  Tr. 1122:25-1123:17, 1125:6-18, 1130:1-10,1131:20-24,1132:19-1133:1(Steffen); Tr. 288:3-6 (McElroy); Tr. 765:16-766:3 (Tuersley); Tr. 1417:16-22 (Garrett).

Plaintiffs presented undisputed testimony that agents were asked to provide sales reports, visit clients homes, complete business plans and produce other documents, as well as to attend

training sessions. Pl. Ex. 539-1, 759; Tr. 736:5-740:9 (Tuersley). There was testimony that agents were required to do a certain number of personal insurance reviews each week and to report their activities to their managers. Tr. 1344:20-1345:2 (Nystrom); Pl. Ex. 56-2; Tr. 949:2-17 (Jammal); 1408:4-6 (Garrett). They were also encouraged to follow certain activities American Family considered to be "best practices". Pl. Ex. 204-25; Tr. 1003:25-1094:13 (Steffen). Although agents were told these best practices were voluntary, their managers' compensation was tied to the agent's compliance with those practices. As a result, many managers implemented mandatory programs for their agents to increase compliance with these standards. Pl. Ex. 530; Pl. Ex. 204: Tr. 1095:13-23 (Steffen). Mr. Nystrom testified that these practices were "just another way of controlling my activities in – in the agency." He also testified that he would have opted out if it were voluntary. Tr. 1339:4-14 (Nystrom).

Agents were required to attend sales and training meetings. Tr. 733:18-20 (Tuersley); 736:2-4 (Tuersley); 739:24-740:20 (Tuersley); 916:14-18 (Jammal); 935:6-17 (Jammal); 937:19-24 (Jammal); 1408:7-13 (Garrett); Pl. Ex. 262, 193-194, 196-197, 199-201. Agents were required to participate in calling nights and other marketing activities, such as manning a booth at a sporting event. Tr. 337:1-338:3, 359:5-360:1 (McElroy); 582:13-583:13 (Miller); Tr. 761:22-25 (Tuersley); Pl. Ex. 262; Tr. 951:17-Tr.955:15 (Jammal); Tr. 1413:23-24 (Garrett). Agents were often required to complete daily or weekly activities reports. Tr. 581:8-582:8 (Miller); Pl. Ex. 56-2; Pl. Ex. 262; Tr. 940:20-942:20; 947:20-951:3 (Jammal); Tr. 761:18-763:18, 767:20-768:6 (Tuersley); Tr. 1344:20-23 (Nystrom); Tr. 1407:12-14 (Garrett); Pl. Ex. 203-8. They were also told what types of policies they had to sell and which to prioritize. Tr. 288: 3-6, 298:14-17 (McElroy): Pl. Ex. 203; Tr. 1131:20-24. They were required to adopt

specific sales techniques and participate in sales campaigns directed at particular types of policies. Tr. 164:11-165:14; 166:3-12 (Rider)(he was told: "everybody is going to do this," "you will do it," and "you don't have a choice.") ; Pl. Ex. 913-21; Pl. Ex. 914-142; Pl. Ex. 916-61; Pl Ex. 931-1723; Pl Ex. 935-98, 99.

Agents were required to attend monthly district meetings. Tr. 341:12-18 (McElroy); Tr. 587:3-9 (Miller); Tr. 1669:6-20, 1672:9-24 (Shope); Tr. 935:6-936:6, 937:19-938:18 (Jammal); Tr. 735:16-736:4, 768:24-769:1 (Tuersley); Tr. 486:18-487:24 (Benusa); Pl. Ex. 531, 539, 185-187, 192-194; 198; Tr. 216:19-217:12 (Zurfluh). Managers communicated to agents that these district meetings were mandatory, even if they interfered with sales appointments, and agents were reprimanded if they showed up late. Pl. Ex. 531, 539, 759, 185-188, 192-194; 196-198; 1672:9-24 (Shope); Tr. 935:6-936:6 (Jammal); Tr. 216:19-217:12; 732:19-740:20 (Tuersley); 159:25-160:8 (Rider); Tr. 287:7-16 (McElroy).

Agents were required to do property re-inspections or surveys, and personal insurance reviews. Tr. 766:9-18 (Tuersley); Tr. 949:2-9 (Jammal); Tr. 1408:4-6 (Garrett); Tr. 1101.17-1102:5 (Steffen); Pl. Ex. 262-2. Property re-surveys were unrelated to selling or servicing insurance and were also performed by outside hired third-parties. Tr. 961:11-962:14 (Jammal); Tr. 1345:5- 1346:4 (Nystrom); Tr. 679:3-680:2 (Jackson). Agents were also sometimes required to accept transferred policies and to service those policies for a year without compensation, and at a reduced commission thereafter. Tr. 2084:3-17 (McCabe); Tr. 955:25-956:25 (Jammal). Agents could also be required to service policies that would never be counted toward their commission base. Tr. 1159:4-11 (Steffen); Tr. 956:8-957:13 (Jammal).

There was testimony that many of these tasks were part of an agent's sales and service

obligations and some were required under the Agreement.  Tr.  1134:1-1136:17, 1178:4-1180:10, 1242:17-1245:5 (Steffen); 1485:15-20, 1520:19-1521:10, 1531:19-22 ,1536:18-22 (Garrett); Defs.' Ex. 68 at 8; Defs.' Ex. 57 at p. 2; Defs.' Ex. 132 at p. 3; Defs.' Ex. 206 at p. 3.

There was conflicting testimony as to whether agents would suffer consequences for disregarding American Family requests.  Tr. 732:19-736:4, 857:21-858:4(Tuersley); Tr. 971:4-972:14 (Jammal);  Tr. 1418:4-16, 1422:25-1423:16,  1426:10-15, 1539:5-1541:11, 1541:19-1542:9, 1543:18-20 (Garrett); Tr. 359:6-360:6 (McElroy); Tr. 1382:9-1383:10 (Nystrom); Tr. 1831:10-15 (Diemer); Tr. 1879:25-1880:10, 1885:17-1888:9 (Miller); Tr. 1911:8-1912:4 (Benusa); Tr. 2026:8-17 (McCabe); Pl. Ex. 539-1.  American Family witnesses claimed that many of the above activities were "expected" but not mandatory.  Tr. 674:10-13 (Jackson).  They also claim that no American Family agent has ever been terminated for failing to do any of these activities.  Tr. 1256:3-1257:22 (Steffen); Tr. 2020:6-19 (McCabe).

Plaintiffs presented testimony that showed American Family managers regularly threatened the agents with termination to obtain compliance, and some terminated employees attributed their termination to a failure to follow the "suggested" policies.  Tr. 1646:25-1647:6, Tr. 1674:10-23 (Shope); Tr. 123:23-124:5, 159:16-160:8, 171:4-8 (Rider); 1336:3-1337:13, 1347:1-1348:5, 1391:12-18 (Nystrom); 932:23-933:24 (Jammal); Tr. 765:1-11 (Tuersley); Pl. Ex. 761-762.  Plaintiffs testified that they were punished whenever they suggested that their manager was exerting control in a manner inconsistent with their independent contractor status. Pl. Ex. 140, Tr. 1450:9-1455:24, 1459:1-1467:13 (Garrett); Pl Ex. 761-762; Tr. 769:6-777:7 (Tuersley); Tr. 971:4-972:24 (Jammal).  Even managers were threatened or disciplined if they refused to exert high levels of control over their agents.  Tr. 618:1-641:23, 570:1-17 (Miller); Pl.

Ex. 340-341.

Managers risked no discipline or termination for telling agents what to do. Tr. 502:13-16 (Benusa); Tr. 1646:25-1647:6 (Shope); Tr. 581:8-582:8 (Miller); Tr. 336:15-21, 338:22-339:5 (McElroy). Under American Family's system, if the managers did not exert control or failed to meet their sales, retention, and sales capacity targets, they risked termination. Tr. 2109:24-2110:2 (McCabe); Tr. 1736:6-9 (Dauplaise); Tr. 618:12-21 629:19-22; 627:17- 628:3; 630:1-632:19; Pl. Ex. 340-2; Pl. Ex. 341 (Miller); Tr. 319:4-320:2 (McElroy). Shope, a former manager and long-time agent, explained, "I was threatened when I wouldn't go threaten [agents for non-compliance]." Tr. 1647:6, 1646:20-21 (Shope) ("you're threatened with it all the time, that your contract will be terminated."). Mr. McElroy testified that "American Family told us that we control these agents' lives and if you told them to jump they had better jump." Tr. 284:13-287:16 (McElroy).

American Family did not train managers to treat agents as independent contractors, or even make managers aware that agents were independent contractors. Tr. 1769:12-1773:6 (Padgett); Tr. 475:20-476:22; 477:24-478:5; 481:12-482:5 (Benusa); Tr. 296:1-297:12 (McElroy); Tr. 1577:16-1578:19; Tr. 1650:18-1651:18; 1652:3-5 (Shope); Tr. 2077:15-2079:3 (McCabe). Chief Sales Officer Gerry Benusa testified that it would be inappropriate to teach managers to manage agents as if they were employees. Tr. 483:23 - 484:9 (Benusa). However, mangers were taught from materials that referred to agents as employees. Pl. Ex. 15,1 6; Tr. 590:6 - 592:17(Miller); Tr. 1652:6-1655:23 (Shope); Pl. Ex. 339. The managers' training manuals instructed managers that they should act as the agents' bosses; "tell them what to do, how to do it, and when it should be done;" show agents that they don't "have good answers to

key objections;" refuse to "permit any deviation from what it takes to succeed;" "require compliance with your directives;" and, require that their "instructions must be followed." Pl. Ex. 519-15, 20; Pl. Ex. 543;40; Pl. Ex. 414-42; Pl. Ex. 521-118; Pl. Ex. 520-144; Pl. Ex. 190-5, 8, 9, 11,; Tr. 1327:16-1329:13 (Johnston).

Some American Family witnesses testified that these instructions were a mistake. Tr. 1256:2-6; 1266:1-3 (Steffen); Tr. 483:23-484:9 (Benusa). This testimony was contradicted by manager testimony, and American Family corporate testimony, which verified that all manuals were approved by American Family, that these techniques and instructions were taught to every manager in training courses, that they were reinforced by higher level sales management at American Family, and that they were consistently used by American Family managers. Tr. 289:19-24 (McElroy); Tr. 610:3-10; 611:11-23 (Miller); Tr. 343:11-21 (McElroy); Tr. 1320:22 - 1329:12 (Johnston); Tr. 1342:2-3 (Nystrom); Tr. 1767:2-1768:21, 1776:19-1778:19 (Padgett); Tr. 700:22-701:12 (Jackson). Managers also testified that the policies taught in these manuals were universal and consistent policies at American Family for decades both before and after the publication of the written manuals, themselves. Tr. 404:25-411:9 (Kaye); Tr. 327:15-335:12 (McElroy); Tr. 604:5-611:23 (Miller); Tr. 1660:11-1661:23 (Shope); Tr. 1337:14-1338:4 (Nystrom). Mr. Kaye testified that when he tried to raise the issue of the agent's possible mis-classification as independent contractors with his superiors, he was ignored and told to drop it. Tr. 397:11-16, 397:23-398:18 (Kaye).

A former high-level officer testified that the Company considered the agents to be independent contractors for IRS purposes only, and that he and other American Family senior management misled the agents by telling them they would be independent contractors for all

purposes. Tr. 396:17-399:6 (Kaye). This was corroborated by other high-level managers, including Mr. Wunsch, a sales management development director who put together a District Manager manual. Tr: 249:3-11 (Wunsch); Tr. 242:4-5, 15-20 (Wunsch); Tr. 197:8-12 (Rider). Mr. Nystrom testified that his manager told him he was not an "independent contractor" but more like a franchisee who has to follow all of the company's rules, regulations and procedures, and do exactly what corporate tells him to do. Tr. 1349:17-1350:1 (Nystrom). Mr. Benusa could not explain why American Family classified agents as independent contractors other than it "has always been that way." Tr. 469:23-470:12 (Benusa).

The above summary of the evidence presented at trial is representative, but is not a comprehensive recitation of all of the relevant evidence presented at first phase of the trial. Therefore, the trial transcripts found at ECF #304-314 are incorporated by reference.


## FINDINGS OF FACT/CONCLUSIONS OF LAW

The Court makes the following findings of fact and conclusions of law based upon the evidence presented at trial:

1. This Court has original jurisdiction under 28 U.S.C. §1331 because the Plaintiffs' claims arise under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, *et seq*.

2. The burden of proof rests with plaintiffs to prove by a preponderance of the evidence that they were common law employees and not independent contractors under ERISA.

3. American Family and its agents entered into Agent Agreements that governed their relationship.

4.  The Agreements indicate that the parties intended for agents to be treated as independent contractors.

5.  Other internal documents including the District Managers Manual and other training manuals indicate that American Family expected its sales managers to exercise control over agents' methods and manner of performing their services.

6.  Under the *Darden* factors, courts are instructed to determine "whether the skill [required of an agent] is an independent discipline (or profession) that is separate from the business and could be (or was) learned elsewhere." *Janette v. American Fidelity Group, Ltd.*, 298 F. App'x 467, 471 (6th Cir. 2008)(Jannette "held numerous jobs for various employers doing exactly this kind of work for more than a decade.")

7.  Insurance agents may be educated, trained, and licensed prior to being hired by a specific agency.

8.  No one can operate as an insurance agent unless they have been licensed by the state in which they work.

9.  American Family almost always hired untrained, and often unlicensed, agents and provided all the training they needed to be an American Family agent.  They provided them all of the training and tools necessary to become an American Family agent and run an agency.

10.  American Family closely supervised its agents through a network of sales management employees, including District Managers who were generally very involved in the day to day activities of their agents.   American Family's sales department has one thousand employees and entire departments that exist solely to support its 2,800 agents. The managers are involved in goal setting, creating the agents business plans, encouraging and directing agents,

and enforcing compliance with these goals and plans. A manager's job depends on the results of the agents and how much they sell.

11. American Family preferred to hire untrained agents so they could be trained in the "American Family" way.

12. "[I]f the individual requires substantial training and supervision, an employee/employer status is more likely." *Worth v. Tyer*, 276 F.3d 249, 263 (7th Cir. 2001).

13. Although it is a consideration, the fact that agents are licensed by the state and/or certified through professional agencies, or that they are able to obtain outside education in their field is not heavily weighted, as there are many professions where employees are required or encouraged to have degrees and/or be certified in their respective areas of expertise prior to hire (i.e. law, accounting, nursing, home care, etc.). Further, in this case, the evidence shows that no such prior training was required prior to being hired by American Family.

14. Under the specific facts of this case, the "amount of skill" factor under Darden weighs slightly in favor of employee status. Although it is possible to obtain licensing and other skills useful in the job of an agent prior to or outside of employment at American Family, and courts have previously held that insurance agents require the requisite level of skill to be considered independent contractors, the evidence in this case shows that American Family specifically sought out potential agents who were untrained. The testimony also showed that they sought untrained potential agents because they wanted to train them in their own procedures and perspectives and wanted them to follow the "American Family" way. Further, there was no evidence presented that would show that the skills learned in American Family training were separate from the business of American Family. If an agent had worked for a different company

prior to being hired at American Family, they were re-trained in the ways of American Family agents upon hire.  There was no testimony as to whether skills learned from American Family translated to work at other agencies upon separation.

15.  The agent's investment in his or her own equipment and tools should be considered in relation to the company's investment in the overall operation when looking at the "source of instrumentalities and tools" factor.  *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 807 (6th Cir. 2015); *Ware v. United States*, 67 F.3d 574, 577 (6th Cir. 1995).

16. American Family agents paid, among other things, for their own rent or building purchase, furniture, equipment, marketing, legal and professional services, client lunches/entertainment, telephone, office supplies, health insurance, automobile, continuing education, and repairs and maintenance for their offices.

17.  American Family required agents to use their computers and their software, but charged a monthly fee for the computer use.

18.  American Family provides agents with software, websites, social media connections, 24 hour call center support, and sometimes subsidized marketing, staff, and other expenses of the agents.

19.  Agents invest heavily in their offices and instrumentalities, and claim significant expenses in their IRS filings.  This is weighed against American Family's  provision of certain tools and instrumentalities which create uniformity among agencies, its control and supply of the computers and software essential to the performance of the agent's job, and its significant investment in research, management, and support functions which benefit both the agent and the company, itself.

20.  In this case, the "instrumentalities and tools" factor under *Darden* weighs slightly in favor of independent contractor status.

21.  When an agent does not work at offices owned or controlled by the company and is not subject to physical supervision in the performance of daily tasks, this *Darden* factor weighs in favor of independent contractor status.  *Weary v. Cochran*, 377 F.3d 522, 527 (6th Cir. 2004); *see also Schwieger v. Farm Bureau Ins. Co.*, 207 F.3d 480, 485 (8th Cir. 1999).

22. American Family agents each had their own office building and did not work onsite at American Family.

23.  American Family agents paid the rent/purchase price and operation costs of their own offices.

24.  American Family agents could not work out of their homes.

25.  American Family retained the right to approve the location of an agent's office, although they did not often exercise this right.

26.  American Family managers sometimes came to agent's office to inspect the office and oversee the agent's work practices.

27.  Although American Family retained some right of control over the location of the work and maintained some degree of supervision over the agents despite their off-site location, the "location" factor under the *Darden* test weighs moderately in favor of independent contractor status.

28.  The evidence shows, and the parties agree that the "duration of the relationship" factor under the *Darden* test weighs in favor of employee status.

29.  Whether American Family has the right to assign additional projects not directly related to the sale of insurance products is anther factor to consider under *Darden*.  The extent to

which the agents have discretion to accept or reject additional projects determines whether this factor weighs in favor of employee or independent contractor status.

30. American Family required agents to provide sales reports, visit homes, participate in call nights, do cold calling, conduct personal insurance reviews, do re-surveys, prepare business plans, service policies without compensation, and fill out daily activity and other reports.

31. Agents did not feel that they were able to refuse to accept these duties.

32. Re-surveys were usually conducted by American Family employees or third party hires who were not agents.

33. Agents were sometimes assigned to service policies that they did not bring in, and for which they were not compensated.

34. The remaining complained of duties were all closely associated with their sale of insurance. While these tasks do not affect the weighting of this factor, they do provide evidence of a high level of control by the company over how and when the agents performed their job of selling insurance.

35. American Family did assign some duties to agents that were not a part of the sale of policies that they were required to perform under their Agent Agreement.

36. The "right to assign additional projects" factor under the *Darden* test weighs slightly in favor of employee status.

37. When the company does not have any authority or discretion over when or how long an agent works, this weighs in favor of independent contractor status. *Weary*, 377 F.3d at 526.

38. American Family requires its agents to keep their offices open during regular business hours, and managers do drop-ins to verify that agents had their offices open during regular business hours

39.  American Family does not require that an agent work during all regular business hours, as long as there is an appointed staff on-site at the office during those hours.

40.  American Family does require agents to work specific times and places for periodic campaign drives, mandatory meetings, and call nights.  They have been trained that they have the authority to enforce participation in these events.

41.  American Family managers have the authority to approve or deny agent vacations, and have in some instances reprimanded agents for taking vacation or otherwise being absent from the office without approval.

42. American Family agents do not punch a clock or record their time worked.

43.  American Family agents are, however, supposed to file daily activity reports.

44.  American Family managers have the final say over agents' business plan, including productivity goals and means of achieving them.  This impacts the agents' ability to control their own hours.

45.  Even agents who did not believe they had to get approval for vacations notified their managers when they planned to take vacation.

46.  Although agents have some discretion over when and how long to work," American Family, through its managers retains some authority to regulate these decisions.  Therefore, this factor weighs slightly in favor of employee status.

47.  The payment of commissions based on sales, rather than payment of a set salary supports an independent contractor relationship.  *Weary v. Cochran*, 377 F.3d at 527; *Ware*, 67 F.3d at 577.

48.  Agents were paid on a commission basis based on their sales.

49.  Agents were paid a monthly stipend unrelated to sales while in training.

50. Agents were sometimes required to provide services on policies without receiving a commission.

51. Agents were given loans on future commissions under an Advance Compensation Plan or Agent Financing Plan. These plans were available primarily to new agents.

52. The "method of payment" factor weighs in favor of employee status for plaintiffs for the duration of their training period only, and weigh s in favor of independent contractor status for plaintiffs once they began selling policies out of their own office.

53. When an insurance agent "employed his own staff at his own expense; had sole discretion in hiring, firing, and compensation matters; and, withheld and remitted taxes to the federal government in his capacity as the employer of his staff members, this weighs in favor of independent contractor status. *Weary*, 377 F.3d at 527.

54. Independent contractor status is not diminished when a company retains the right to impose qualification standards on an agent's staff, so long as the company didn't dictate who agent could hire. *Chai v. Allstate Ins. Co.*, No. C-1-03-566, 2005 WL 6778901, at *7 (S.D. Ohio Apr. 28, 2005).

55. American Family agents had primary authority to hire their own staff and had discretion in who they would hire.

56. The agents were responsible for paying their own staff, determining and paying for any benefits and taxes associated with that staff, and determining whether to classify their staff as employees or independent contractors.

57. Some agents employed family members as staff.

58. Agents had the option not to hire any staff, but it would have been extremely difficult, if not impossible, to meet required production requirements without the assistance of

staff.

59. American Family imposes qualifications on appointed agency staff, including state licensure, clean driving records, education levels, credit history, and minimum income to debt ratios.

60. American Family did not provide computer access to any non-approved appointed agency staff.

61. American Family required agency staff to agree to a life-time non-solicitation agreement.

62. American Family advertised for, recruited and interviewed potential agency staff and provided "pre-approved" candidates from which the agents could select their staff.

63. Agents were not required to hire these pre-screened candidates.

64. American Family retained the right to fire any agency staff, appointed or non-appointed, who did not live up the American Family Code of Conduct.

65. Agents did not have sole discretion in hiring and firing their staff.

66. Agents did have primary authority to hire and fire and their staff.

67. Agents had sole discretion in staff compensation matters, and the sole responsibility to withheld and remitting taxes to the federal government as the employers of their staff.

68. American Family managers were evaluated on the number of staff employed by their agents, and would sometimes offer monetary subsidies to agents to hire more staff.

69. American Family retained some authority to approve or disapprove of both appointed and non-appointed agency staff selections, above and beyond the imposition of relevant qualification requirements on appointed staff.

70. American Family retained the right to fire agency staff, although this right was not

widely exercised.

71.  Although American Family retained some right to override an agent's hiring and firing decisions, on balance, agents had primary authority over hiring and paying their assistants.

72.  The "party's role in hiring and paying assistants" factor under Darden is neutral.

73.  "The more integral the worker's services are to the business, then the more likely it is that the parties have an employer-employee relationship."  *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 807 (6th Cir. 2015).

74.  American Family could not exist as a company without the sales generated by their agents.

75.  The parties agree, and the evidence supports a finding that the work performed by agents is not only an integral part of American' Family's regular business, but is part and parcel of its core function, which is to sell and service insurance policies.

76.  In this case, the degree to which the "work is part of the regular business of the hiring party" factor under *Darden* weighs heavily in favor of employee status.

77.  If American Family provided agents with regular employee benefits, or the same benefits it provided to its employees, it would factor in favor of employee rather than independent contractor status.  *See, e.g., Wolcott v. Nationwide Mutual Ins. Co.*, 884 F.2d 245, 251 (6th Cir. 1989).

78.  American Family did not provide agents with vacation pay, holiday pay, sick pay, or paid time off.

79.  Vacation pay, holiday pay, sick pay, and other paid time off are regular employee benefits, at least some of which were provided to American Family's employees.

80.  American Family agents are not eligible for the pension and retirement plans offered

to American Family employees.

81. American Family agents are required to obtain, maintain, and pay for their own health insurance.

82. American Family did offer its agents a retirement or pension plan in the form of extended earnings. Agents were automatically enrolled in these plans, did not contribute to these plans, and received increasing benefits with increasing years of service.

83. American Family provides a death benefit to agents.

84. American Family provides life insurance to some agents, but others have to pay for their own.

85. American Family did not offer its agents the same benefits it provided to its employees.

86. American Family did not provide its agents with all of the regular employee benefits.

87. American Family did provide retirement, and sometimes life insurance, benefits that would be considered "regular employee benefits."

88. The "provision of employee benefits" under *Darden* weighs slightly in favor of independent contractor status.

89. There is no dispute that American Family treated their agents as independent contractors for tax purposes, and that agents filed their taxes as independent contractors.

This weighs in favor of independent contractor status under *Darden*.

90. The *Darden* factors are almost evenly split between favoring employee status and favoring independent contractor status.

91. The method of payment (following the training period), and tax treatment clearly favor independent contractor status. The duration of the relationship, and the fact that the

agents' work is the core business of the company clearly favor employee status. All other factors contain a mix of characteristics between the two designations.

92. American Family, either directly or through its managers, appeared to retain at least some degree of control, albeit sometimes slight, over their agents' decisions in nearly every category. When an agent met American Family standards and employed American Family techniques, this control was not exercised. However, if the agent did not agree with or follow American Family directives and suggestions, control would be exercised by most managers in the form of reprimands, threats, and potential termination.

93. *Darden* factors are not exclusive in the determination of employee versus independent contractor status.

94. "The 'employer's ability to control job performance and the employment opportunities of the aggrieved individual' are the most important of the many factors to be considered." *Marie v. Am. Red Cross*, 771 F.3d 344, 356 (6th Cir. 2014)(quoting *Janette v. Am. Fid. Grp., Ltd.*, 298 F. App'x 467, 472 (6th Cir. 2008) and citing *Simpson v. Ernst & Young*, 100 F.3d 436, 442 (6th Cir. 1997); *Trs. Of the Resilient Floor Decorators Ins. Fund v. A & M Installations, Inc.*, 395 F.3d 244, 249 (6th Cir. 2005); and *Johnson v. City of Saline*, 151 F.3d 564, 568 (6th Cir. 1998)).

95. American Family agents did not own a book of business.

96. American Family agents did not own any policies.

97. American Family could and did unilaterally reassign policies brought in by one agent, to other agents.

98. American Family could require agents to service policies that they did not initiate without compensation.

99. American Family did not allow agents to sell insurance from any other companies, even when American Family did not carry the type of coverage offered by a competitor, except through approved partner agencies with a financial connection to American Family.

100. American Family actively discouraged and in some cases prohibited agents from taking on other employment even if it was unrelated to insurance sales.

101. American Family required its agents to sign a one year non-compete agreement effective upon termination. American Family required agency staff to sign a lifetime non-compete agreement prohibiting any contact with American Family agency clients.

102. American Family controlled the employment opportunities of its agents.

103. American Family trained its sales managers to treat agents in the same manner as they would treat employees.

104. American Family trained its sales managers to believe that they were the agents' bosses and had the authority to demand compliance from agents whenever an agent disagreed with them.

105. American Family held their sales managers liable for any perceived shortcomings of their agents.

106. American Family training manuals actually refer to agents as "employees."

107. These manuals and training methods were reviewed and approved by the Company. They were not mistakes or aberrations, but documented the approach American Family wanted their managers to take when managing agents.

108. Managers were not instructed to treat agents as independent contractors.

109. Some, but not all, managers considered agents to be independent contractors "for tax purposes only."

110.  American Family managers, consistent with their training, acted as if they had the right to control the manner and means by which their agents sold and serviced insurance policies. They believed that they had the authority to reprimand and terminate (or at least threaten termination) in order to require compliance when an agent disagreed with their decisions or requests.

111.  Not all managers exercised this right, but many did.

112.  The employer does not have to exercise its right to direct or control the manner and means of work, if it retains the right to do so.  *See, Peno Trucking, Inc. V. C.I.R.,* 296 F.App'x 449, 456 (6th Cir. 2008); *N.L.R.B. v. Cement Transp., Inc*., 490 F.2d 1024, 1027 (6th Cir. 1974)("It is the right to control, not its exercise, that determines an employee relationship.").

113.   Although the Sixth Circuit, along with several others, has found insurance agents to be independent contractors and not employees for the purpose of federal employment law, none of the factual scenarios presented in any of the cited cases show retention of the same level and breadth of control by the Company that was evidenced in this case.  Further, Defendants have not cited any Sixth Circuit cases involving American Family agents.

114.   The advisory jury in this case unanimously found that Plaintiffs proved by a preponderance of the evidence that they are employees of Defendant American Family.

115.  It is within the trial court's discretion to accept or reject the verdict, or the interrogatory responses of an advisory jury. *Hyde Properties v. McCoy*, 507 F.2d 301, 306 (6th Cir. 1974); *Morelock v. NCR Corp*., 546 F.2d 682, 689 (6th Cir. 1976), *vacated on other grounds*, 435 U.S. 911 (1978); *see also* Fed. R. Civ. P. 52(a)(1).

116.  This Court finds that based on all of the evidence and arguments presented, that the jury's response to the interrogatory was consistent with the evidence and the law.

117. This Court finds that American Family agents are and were employees for purposes of ERISA during the class period.

<u>CONCLUSION</u>

For the foregoing reasons this Court finds, that although the retention and exercise of control of the means and manner of the agents' service was not technically allowed under the terms of the Agency Agreement, American Family did expect its managers to exercise such control whenever necessary to achieve compliance with Company goals and standards. American Family trained its managers to exercise control over the means and manner of agents' sales and service duties when the company deemed it necessary, and reprimanded managers who did not exercise such control when the Company deemed it beneficial to do so. Consequently, at least some managers did, in fact, exercise a high level of control over some of their agents. The degree of control managers were encouraged to exercise was inconsistent with independent contractor status and was more in line with the level of control a manger would be expected to exert over an employee. This, along with the evidence related to the other factors set forth above, supports a finding that the American Family agents defined in the class description should have been classified as employees and not independent contractors. Therefore, the Court finds that the class Plaintiffs in this case were employees of American Family during the relevant class period.

The Court finds, pursuant to 28 U.S.C. §1292(b), that an interlocutory appeal may materially advance the ultimate termination of the litigation because: (1) there was evidence supporting both sides in this case; (2) prior case law has been nearly unanimous in finding that insurance agents generally are to be classified as independent contractors; (3) the repercussions

of this finding are so far-reaching; and, (4) the resolution of damages will be unusually complicated.   Therefore, the Court authorizes the parties to take an interlocutory appeal of this Order, pursuant to 28 U.S.C. §1292(a)(1).  This case shall be stayed pending the resolution of any such appeal.  The parties shall notify the Court within ten days whether an appeal was, in fact, filed.   IT IS SO ORDERED.


      /s/ Donald C. Nugent
Judge Donald C. Nugent
United States District Judge

DATED:  July 31, 2017